**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

<table>
<tr><td>IN RE CHELSEA THERAPEUTICS<br>INTERNATIONAL LTD.<br>STOCKHOLDERS LITIGATION</td><td>)<br>) Consol. C.A. No. 9640-VCG<br>)</td></tr>
</table>

## MEMORANDUM OPINION

Date Submitted: February 19, 2016
Date Decided: May 20, 2016

Seth D. Rigrodsky, Brian D. Long, Gina M. Serra, and Jeremy J. Riley, of RIGRODSKY & LONG, P.A., Wilmington, Delaware; Ryan M. Ernst and Daniel P. Murray, of O'KELLY ERNST & BIELLI, LLC, Wilmington, Delaware; OF COUNSEL: Donald J. Enright and Elizabeth K. Tripodi, of LEVI & KORSINSKY, LLP, Washington, District of Columbia; Kent A. Bronson, of MILBERG LLP, New York, New York, *Attorneys for Plaintiffs*.

S. Mark Hurd and Thomas P. Will, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Brian A. Herman and John A. Vassallo, III, of MORGAN, LEWIS & BOCKIUS LLP, New York, New York, *Attorneys for Defendants Joseph G. Oliveto, Michael Weiser, Kevan Clemens, Roger Stoll, and William D. Rueckert*.

GLASSCOCK, Vice Chancellor

The duty of loyalty under which a corporate director must act is exacting, but narrow. That duty, properly understood, allows directors wide latitude to take action and embrace risk for the benefit of the corporation. The exacting constraints include that such action must be in the interest of the corporation and its owners, the stockholders; the duty prohibits actions for the benefit of the director herself, or others to whom she is beholden, absent entire fairness to the corporation. That is the most straightforward part of the loyalty obligation.

The duty of loyalty also requires that disinterested, independent directors act in good faith. The good-faith corollary to the duty of loyalty is something of a catch-all. Good faith—the absence of actions taken in bad faith—prohibits board action intended for purposes other than corporate weal, even though taken by independent, disinterested directors.[1] Intentional dereliction of duty, "inaction in the face of a duty to act," may also constitute bad faith.[2] Chancellor Chandler has described the application of bad-faith analysis, appropriately in my view, as "hazy jurisprudence."[3] To my mind, one part of the good-faith component of the duty of loyalty allows the equity judge something akin to a "fiduciary out" from the business judgment rule, for situations where, even though there is no indication of conflicted

---

[1] *In re The Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 754–55 (Del. Ch. 2005). Good faith also prohibits directors from taking actions in breach of positive law, despite any potential benefits that such illegal acts may bestow on the corporation. *Id.*
[2] *Id*. at 755.
[3] *Id.* at 754.

interests or lack of independence on the part of the directors, the nature of their action can in no way be understood as in the corporate interest: *res ipsa loquitur.* Thus conceived, bad faith is similar to the much older fiduciary prohibition of waste, and like waste, is a *rara avis.* This matter involves the Plaintiffs' unsuccessful pursuit of that rare bird.

This matter is before me on Defendants' Motion to Dismiss the Plaintiffs' Second Verified Consolidated Amended Complaint (the "Second Amended Complaint"). Plaintiffs Joseph Hetland, Robert Countryman, and Richard Rotundo are representative stockholders of Chelsea Therapeutics International, Ltd. ("Chelsea" or the "Company"), a developmental biopharmaceutical company, which has researched and developed a drug called NORTHERA™ ("Northera") to treat symptomatic neurogenic orthostatic hypotension ("NOH").[4] The Defendants—Joseph G. Oliveto, Kevan Clemens, William D. Rueckert, Roger Stoll, and Michael Weiser—are members of the Chelsea Board of Directors (the "Board").

The Plaintiffs bring this class action, alleging breaches of fiduciary duty against the Defendants in connection with the sale of Chelsea to Lundbeck A/S ("Lundbeck") through a tender offer and short-form merger (the "Transaction"). The Plaintiffs contend that the Defendants knowingly sold the Company for an

---

[4] NOH is a rare disorder that causes low blood pressure upon standing, and is often associated with Parkinson's disease.

amount substantially below its standalone value, and, in furtherance of that disloyal act, improperly instructed Chelsea's financial advisors to ignore one set of financial projections of the Company, which assume a higher market share for the Company if the FDA were to remove the Company's primary competitor from the market; and also chose themselves to disregard a second set of projections, which predict increased revenue streams to the Company should the FDA, in the future, approve Northera for the treatment of other medical conditions for which its use is currently neither proven effective nor approved. The Plaintiffs contend that the Defendants intentionally concealed the true, higher value of the Company from its stockholders, and also raise several other issues regarding the sales process and terms of the Transaction, most of which have since been waived.[5]

As clarified at oral argument on Defendants' Motion to Dismiss, the Plaintiffs proceed here on a narrow bad-faith claim—that the Board acted in *bad faith* by instructing its financial advisors to ignore one set of projections in opining on the fairness of the Transaction, and by choosing to disregard a second set of projections

---

[5] These additional issues concern allegedly improper deal-protection terms; change-in-control payments and the opportunity for future employment for the Defendants, in the event of a transaction; and the Company's contingent-fee arrangements with its financial advisors. The Plaintiffs have abandoned any claims regarding the deal-protection terms and contingent-fee arrangements, conceding in their answering brief on Defendants' Motion to Dismiss that those issues "are not alleged to form an independent basis for liability" and merely provide "context" surrounding why the financial advisors allegedly supported the Transaction at an unfair price. Pls' Answering Br. at 27, n.4. I find unconvincing the Plaintiffs' remaining allegations concerning the change-in-control payments, as discussed below.

before recommending the Transaction to Chelsea's stockholders.[6] The Plaintiffs argue that these actions led to the under-valuation of the Company, and are inconceivable as anything other than actions against the interests of the stockholders, maximizing value for whom was, at that point, the only proper purpose of the Board. Thus, despite the independent and disinterested nature of the Board, the directors must have acted in bad faith. The Defendants moved to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6); for the following reasons, I grant the Defendants' motion.

## I. BACKGROUND[7]

Because any process claims relating to the Transaction have been abandoned, I include only a brief recitation of the facts pertinent to the narrow question before me now.

### A. Chelsea's Standalone Prospects

In February 2014, the United States Food and Drug Administration ("FDA") granted accelerated approval of Northera to treat NOH.[8] Northera was given "orphan" drug status, which designation carries with it certain development incentives, "including [seven-year] market exclusivity, tax credits, enhanced patent

---

[6] *See* Oral Argument Tr. 38:17–20.
[7] The background facts are drawn from the Plaintiffs' Second Verified Consolidated Amended Complaint ("Second Am. Compl."), and are presumed true for the purpose of evaluating Defendants' Motion to Dismiss.
[8] Second Am. Compl. ¶ 12.

protection, and clinical research subsidies."[9] The Plaintiffs contend that, following Northera's FDA approval, the Company held significant standalone value from Northera's limited competition on the market and its hypothetical future applications to treat other conditions.

1. Northera's Limited Competition: The "No-Midodrine Projections"

Northera's primary competitor is a drug called Midodrine.[10] In September 2010, the FDA gave notice that it intended to take Midodrine off the market, due to its side effects and ineffectiveness.[11] After this announcement was met with public outcry from patients and physicians alike, however, the FDA changed course and allowed Midodrine's producer to continue marketing Midodrine while conducting testing to seek final approval of the drug.[12] The Plaintiffs contend that, although final approval of Midodrine is still possible, neither its producer nor the FDA have any incentive to pursue that outcome, as Midodrine is a generic drug with little impact on its producer's total earnings.[13] Moreover, the Plaintiffs contend that, even if Midodrine remains on the market indefinitely, Northera stands to gain substantial market share as the superior drug.[14]

The Chelsea Board has recognized the possibility of Midodrine's removal

---

[9] *Id.* at ¶ 15.
[10] *Id.* at ¶ 16.  Midodrine is a drug sold under the name ProAmatine by Shire PLC.  *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.* at ¶ 17.
[14] *Id.* at ¶ 19.

from the market, and the potential for resulting upside for Chelsea, since at least February 2011;[15] it has consistently prepared financial projections that estimate an increase of 16% in Northera's market share should Midodrine be removed from the market (the "No-Midodrine Projections").[16]

2. Additional Applications of Northera: The "L.E.K. Study"

Following the FDA's 2014 approval of Northera, the Chelsea Board commissioned a study prepared by L.E.K. Consulting (the "L.E.K. Study") to predict potential revenue streams that would result if the FDA should approve additional applications of Northera for treatment of conditions other than NOH, including freezing of the gait, intradialytic hypertension, attention deficit hyperactivity disorder, and fibromyalgia.[17] In conducting its analysis, L.E.K. Consulting interviewed physicians and assessed secondary research and analytics, ultimately concluding, *without adjusting for risk*, that "Northera's additional applications could represent $860 million in revenue potential in 2030."[18]

*B. The Lundbeck Transaction*

Prior to achieving FDA approval, Chelsea had engaged Torreya Capital ("Torreya") to conduct a strategic review evaluating potential transactions.[19]

---

[15] *Id.* at ¶ 20.
[16] *Id.*
[17] *Id.* at ¶¶ 22–23.
[18] *Id.* at ¶ 24.
[19] *Id.* at ¶ 27.

Through this process, Torreya contacted 65 companies during 2013, but none of the companies submitted either an informal or formal proposal to Chelsea.[20] Owing to a potential conflict on the part of Torreya, the Company later retained Deutsche Bank as a second financial advisor.[21]

Following Northera's FDA approval, several potential buyers expressed renewed interest in acquiring the Company.[22] On March 31, 2014, Lundbeck submitted a bid to acquire Chelsea for $6.44 per share in cash.[23] The Board met to consider the offer on April 3, 2014.[24] During that meeting, the Board considered analyses, prepared by Deutsche Bank, concerning Chelsea's standalone value, including a discounted-cash-flow analysis that indicated that Chelsea could be worth $11.32 to $15.02 per share if Midodrine was removed from the market.[25] After weighing the offer against Chelsea's standalone value, the Board instructed its financial advisors to inform Lundbeck that its offer was insufficient.[26] Lundbeck responded with a revised offer on April 11, 2014, maintaining its offer of $6.44 per

---

[20] *Id.*

[21] *Id.* at ¶ 28.

[22] According to the Company's May 2014 14D-9, over a 20-month period beginning in August 2012, Chelsea's financial advisors contacted 84 potential buyers; of those, 14 signed confidentiality agreements, 12 were sent a bid process letter by the Company, and 5 actively participated in the bid process. Defs' Opening Br., Transmittal Aff. of Thomas P. Will ("Will Aff."), Ex. 1, at 15–25. Ultimately, only Lundbeck submitted a proposal to the Company.

[23] Second Am. Compl. ¶ 29.

[24] *Id.*

[25] *Id.*

[26] *Id.*

7

share cash, and sweetening the deal by adding potentially lucrative contingent value rights ("CVRs") to Chelsea stockholders based on the Company achieving certain future sales targets.[27] The enhanced offer represented a price premium of around 30%, to as much as 60%, if the CVRs returned maximum value.[28]

At the time Lundbeck made its revised offer, the Board had been reviewing and relying upon various financial models for the Company, which the Plaintiffs label the "Base Case, the Adjusted Base Case, and the No-Midodrine Projections."[29] The first assumes only one possible application for Northera (the treatment of symptomatic NOH); the second makes this same assumption, but reflects a higher level of net sales owing to an increase in the size of Chelsea's sales force; and the third, as described above, adjusts the Base Case to assume an increased market share for Northera following the hypothetical removal of Midodrine from the market.[30] None of these three financial models reflects the results of the L.E.K. Study—that is, potential revenue streams resulting from hypothetical new applications of Northera.

The Plaintiffs contend that, when faced with the Lundbeck offer, rather than resting on Chelsea's strong standalone value, the Board directed Deutsche Bank to

---

[27] *Id.* at ¶ 30.
[28] Will Aff., Ex. 1, at 26–27.
[29] Second Am. Compl. at ¶ 31.
[30] *Id.*

8

exclude the No-Midodrine Projections from further consideration.[31]  The Board did this, the Plaintiffs contend, even though it "did not dispute the reasonableness of the assumptions in the No-Midodrine Projections, nor any of the individual forecasts,"[32] and with a "single purpose: to allow Deutsche Bank [to] prepare a fairness opinion for the Board that could act as window dressing for a knowingly unfair price."[33]  Just over a month after Lundbeck's initial offer, the Board agreed to sell Chelsea to Lundbeck for $6.44 per share and CVRs of up to an additional $1.50 per share if certain annual sales targets are met between 2015 and 2017.[34]  The Lundbeck Transaction, according to the Plaintiffs, undervalues the Company by between $266 million and $558 million.[35]

The Plaintiffs also allege disclosure deficiencies in Chelsea's May 2014 14D-9 issued in connection with the Transaction.[36]  As clarified at oral argument, the Plaintiffs' objection is limited to the omission of the No-Midodrine Projections and the results of the L.E.K. Study (collectively, the "Projections") from the 14D-9,

---

[31] *Id.* at ¶ 35.  To be clear, the Plaintiffs do *not* allege that Deutsche Bank knew about, or had ever relied upon, the results of the L.E.K. Study.  The Plaintiffs allege only that Deutsche Bank's analysis "ignores the value in Chelsea's product line from Northera for the treatment of ADHD, fibromyalgia, and CFS, and from CH-4051 for the treatment for the treatment of RA," and that, "[h]ad Deutsche Bank employed a positive perpetuity growth reflecting the value from all of Chelsea's potential revenue streams, the per share ranges derived from the [discounted cash flow] would have exceeded the value of the consideration paid in the Transaction." *Id.* at ¶ 39.

[32] *Id.* at ¶ 34.

[33] *Id.* at ¶ 35.

[34] *Id.* at ¶ 36.

[35] *Id.* at ¶ 37.

[36] *Id.* at ¶ 47.

9

after the Board had already shared that information with potential buyers—including Lundbeck—as part of the due diligence process.[37]  I note, however, that while the Company did not disclose to stockholders the substance (including the implications to value) of the No-Midodrine Projections, it did disclose that the Board had considered the No-Midodrine Projections, ultimately concluding that they were too speculative to be quantifiable, and that it had instructed Deutsche Bank not to take them into account in preparing its financial analysis.[38]

Finally, the Plaintiffs allege that the Board, unlike Chelsea stockholders, were able to "recoup" a portion of the value lost by selling the Company at too low a price because the Defendants were, collectively, entitled to receive over $3 million in special change-of-control payments as a result of the deal.[39]  If a sale closed by the end of 2014 (through a "sales event" under the Company's Executive Retention Bonus Plan), Oliveto and other senior executives stood to receive a bonus of 50% of their base salary, and each of the Company's four non-executive Board members

---

[37] The Plaintiffs appear to have waived any disclosure claims, stated in the Second Amended Complaint, regarding alleged conflicts of Chelsea's financial advisors and wording in the Company's 2014 14D-9 concerning Lundbeck's initial offer.  *See* Oral Argument Tr. 38:17–20.

[38] *See* Will Aff., Ex. 1, at 21 ("In addition, the Company Board discussed with Deutsche Bank and Torreya the history of midodrine, the only other currently approved drug for the treatment of orthostatic hypotension and certain projections prepared by management of the Company assuming that midodrine was taken off the market or would have a restriction for use added to its label by the FDA (the 'no-midodrine case'). The Company Board concluded that the no-midodrine case was highly speculative and, accordingly, not quantifiable and instructed Deutsche Bank not to take such case into account in its financial analysis.").

[39] Second Am. Compl. ¶ 41.

would receive a bonus of 50% of the cash compensation paid to each director in 2013.[40] Additionally, the Plaintiffs allege that, because Lundbeck expected to retain Chelsea's senior management following the Transaction, management had the opportunity—unlike Chelsea stockholders—to participate in any future upside of the Company through future equity awards and performance-based compensation.[41]

### C. Procedural Posture

The Plaintiffs filed their initial Verified Class Action Complaint on May 9, 2014, alleging breaches of fiduciary duty by the Defendants in connection with the Transaction for failing to sufficiently inform themselves of, or disregarding, Chelsea's standalone value; and for agreeing to a sale of the Company at an unfair price. The Plaintiffs filed a Verified Amended Consolidated Class Action Complaint (the "First Amended Complaint"), a motion to expedite, and a motion for a preliminary injunction on May 30, 2014. After full briefing and argument on the motions, then-Vice Chancellor Parsons denied the Plaintiffs' motion for a preliminary injunction on June 18, 2014.[42] The tender offer closed on June 20, 2014. Nearly one year later, the Plaintiffs filed a Second Verified Consolidated Amended Complaint on June 16, 2015. The Defendants moved to dismiss the Second Amended Complaint, and the parties completed full briefing of the motion (the

---

[40] *Id.*

[41] *Id.*

[42] *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, C.A. No. 9640-VCP (Del. Ch. June 18, 2014) (Parsons, V.C.) (TRANSCRIPT).

11

"Motion"). With respect to the matters presented on the Motion, the First and Second Amended Complaints are substantively the same. The case was then reassigned to me, due to Vice Chancellor Parsons's retirement, and I heard argument on the Motion on February 19, 2016.

## II. ANALYSIS

The Defendants have moved to dismiss the Second Amended Complaint under Court of Chancery Rule 12(b)(6) on the ground that the Plaintiffs fail to state a claim upon which relief may be granted. Under this rule, I must accept the allegations of the Second Amended Complaint as true, drawing all reasonable inferences therefrom, and dismiss only if the Plaintiffs "would not be entitled to recover under any reasonably conceivable set of circumstances."[43]

### A. The Disclosure Claims

To the extent post-closing damages claims based on allegedly inadequate disclosures remain, they involve failure to disclose the Projections. Then-Vice Chancellor Parsons rejected Plaintiffs' motion for a preliminary injunction based on these same disclosure claims from the bench following a hearing. In connection with his denial of the preliminary injunction (under the standard applicable there),[44]

---

[43] *See Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).

[44] The Vice Chancellor examined the record developed in connection with the preliminary injunction request, and found that the Plaintiffs had not shown a likelihood of success on the merits. Because of the different standard here, the findings of the Vice Chancellor are persuasive, but not necessarily law of the case.

12

the Vice Chancellor made findings of fact in his decision (the "Bench Decision"), based on the allegations of the First Amended Complaint. With respect to the L.E.K. Study, the Vice Chancellor found that

> there is no evidence that the L.E.K.'s assessment of the revenue potential of Northera's other applications was relied on by the board in approving the transaction, or by the company's financial advisors in their analyses, or in Deutsche Bank's fairness opinion. . . . Second, the [hypothetical] applications of Northera that were considered by L.E.K., and the projected revenues based on those applications[,] are highly speculative.[45]

With respect to the No-Midodrine Projections, the Vice Chancellor noted that

> the minutes from the April 3 and April 15, 2014, board meetings of Chelsea indicate that the board considered the no-midodrine and midodrine restricted scenarios to be speculative and highly unlikely to occur.
>    The April 3 board minutes state—and this is a quote—"The Board discussed the status and history of midodrine. It was viewed as highly unlikely that midodrine would be removed from the market, regardless of the outcome of the clinical studies, and there had already been significant patient group and physician backlash to the possibility of removing midodrine from the market. While withdrawal was viewed as an unlikely scenario, the Board noted that potential upside from such a case could be used during the negotiations."
>    Plaintiffs argue that the fact that the board considered the potential value of using no-midodrine projections in negotiations and the fact that management apparently did reference those projections, among others, in subsequent presentations to bidders or potential bidders, demonstrate that the no-midodrine projections were significant and reliable. To my mind, however, the board or management's use of optimistic figures in an effort to solicit higher offers is not persuasive evidence that those figures are, in fact, reliable or likely to alter the total

---

[45] *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, C.A. No. 9640-VCP, at 16:9–13, 16:24–17:3 (Del. Ch. June 18, 2014) (Parsons, V.C.) (TRANSCRIPT).

mix of information available to shareholders.[46]

At oral argument on Defendants' Motion, the Plaintiffs conceded to the Court that nothing new with respect to these disclosure claims has come to light or been pled since the preliminary-injunction hearing.[47]  Therefore, for the cogent reasons set forth in the Bench Decision (including those parts not quoted above), I find that the Plaintiffs have failed to allege disclosure violations concerning the Transaction sufficient to be actionable.  The Plaintiffs at oral argument did not argue convincingly to the contrary.[48]  They do argue that they should be able to pursue a claim that—independent of any claims regarding inadequate disclosures—the Board's decision to ignore value implied by the Projections was made in bad faith.

*B. The Bad-Faith Claim*

Given that this matter is before me in the posture of a post-closing damages suit, and because I have found no disclosure violations, the Defendants urge me to extend to this case the rule established by the Delaware Supreme Court in *Corwin v. KKR Financial Holdings LLC*[49]—that is, they argue that should I should make a finding that the disclosures were adequate to cleanse any bad faith on the part of the

---

[46] *Id.* at 21:11–22:13.

[47] Oral Argument Tr. 42:8–11.

[48] I find no issue, as the Plaintiffs urge me to, with the fact that the Board had provided the potential buyers with the L.E.K. Study and the No-Midodrine Proposals, but then later omitted these projections from the Company's 2014 14D-9 statement.  To my view, the Board's tactical choice to share these projections with prospective buyers was mere puffery, and for the reasons set forth in the Bench Decision, not material to stockholders.

[49] 125 A.3d 304 (Del. 2015).

14

directors and that, under the business judgment rule, I should thus dismiss the action.[50] The Plaintiffs disagree; and I note that the Board failed to disclose what the Plaintiffs allege was the Board's bad-faith decision to disregard value implied by the Projections. It is unclear that the rule in *Corwin*, in any event, would cleanse a bad-faith act, even if disclosed. I need not resolve this issue, however, because the Second Amended Complaint fails to state a claim in any event.[51] The Defendants here are exculpated from duty-of-care claims under Section 102(b)(7),[52] and the Plaintiffs have not articulated a claim for breach of the duty of loyalty, beyond the narrow bad-faith claim just referred to. For the reasons below, I find the facts alleged insufficient to support this claim.

The crux of Plaintiffs' argument centers on the decision by the Board, against the backdrop of an offer from Lundbeck, to direct its financial advisors to opine on the fairness of the Transaction without considering value implied by the No-Midodrine Projections, and to recommend the Transaction without considering, or directing its financial advisors to consider, the L.E.K. Study. As described above,

---

[50] The *Corwin* court held that where a transaction has been approved by a fully informed and uncoerced stockholder vote, that is, "where the stockholders have had the voluntary choice to accept or reject a transaction, the business judgment rule standard of review is the presumptively correct one and best facilitates wealth creation through the corporate form." *Id.* at 314; *see also In re Zale Corp. S'holders Litig.*, 2015 WL 6551418, at *2–3 (Del. Ch. Oct. 29, 2015) (discussing the "cleansing effect of a fully informed, statutorily required vote").

[51] The parties also dispute whether *Corwin* should apply to a tender offer, another issue that I need not consider here. *See* Oral Argument Tr. 38:24–39:3.

[52] 8 *Del. C.* § 102(b)(7).

15

the first of the Projections, the No-Midodrine Projection, estimates the potential increase in Northera's market share in the event that the FDA removes Northera's primary competitor, Midodrine, from the market. The second, the L.E.K. Study, projects profits in 2030, more than 15 years out from the time of the study, if Northera were hypothetically approved by the FDA for treatment of other conditions, for which its use is currently prohibited, and implies a value *without* adjusting for risk. The Plaintiffs contend that excluding the Projections from consideration by the financial advisors allowed the advisors to find the Transaction fair when in fact it was not, allowed the directors to recommend an inadequate sales price, and constituted faithless acts on the part of the directors.

As this Court explained in *Dent v. Ramtron International Corp.*,[53] to state a bad-faith claim, a plaintiff must show either "an 'extreme set of facts'" to establish that "'disinterested directors were intentionally disregarding their duties,'" or that "the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[54] The Plaintiffs do not contend that the Defendants are not entitled to business-judgement protection because they are conflicted in the Transaction. In fact, they concede that the Defendants held equity positions, which aligned their interests—maximum

---

[53] 2014 WL 2931180 (Del. Ch. June 30, 2014).
[54] *Id.* at *6–7 (citations omitted).

16

value—with the other stockholders. Nonetheless, the Plaintiffs point to "change-in-control" payments to which the Defendants were entitled should the Company be sold.[55] The Plaintiffs point out that these payments, not available to the other stockholders, allowed the Defendants to recoup (at least in part) the loss to them engendered by the allegedly faithless exclusion of the Projections. Of course, if there were a well-pleaded allegation that the change-in-control payments exceeded, in a way material to the Defendants, the loss engendered by an intentional under-valuation of the Company in aid of the Transaction, a loyalty breach would have been pled. Here, however, the failure to allege that the change-in-control payments were even sufficient to overcome the alleged loss does not support a finding of bad faith.[56]

---

[55] The Second Amended Complaint also alleges that the fact that Lundbeck intended to retain management might have colored the Defendants' action; such an allegation is unavailing in light of the contention that Chelsea should have continued as an independent entity, implying continued management employment in any event.

[56] The Company's May 2014 14D-9 reveals that the Defendants each had considerable stock holdings and options for which they stood to receive significant merger consideration. *See* Will Aff., Ex. 1, at 7. Defendants Oliveto, Weiser, Stoll, Rueckert, and Clemens held 3,500, 450,178, 40,000, 50,000, and 5,000 shares of Chelsea stock, respectively, as of May 22, 2014, as well as significant numbers of options—convertible, at the effective date of the Transaction, into cash—and CVRs potentially owed in respect of those shares and options. *Id.* The Defendants stood to earn millions of dollars for their shares and options: assuming no payment on the CVRs, Defendants Oliveto, Weiser, Stoll, Rueckert, and Clemens would earn $2,455,790, $4,244,008, $1,289,300, $1,198,150, and $1,454,159, respectively; and with maximum payment on the CVRs, $3,473,540, $5,464,978, $1,769,300, $1,648,150, and $2,035,724, respectively.

On the other hand, the 14D-9 reveals that, with the exception of Oliveto—who stood to earn sizeable change-in-control and severance payments under a pre-existing severance agreement and retention plan, *id.* at 7—the Defendants would earn change-in-control payments of roughly only $40,000, *id.* at 9. Comparing the large sums that the Defendants stood to gain from the Transaction due to their ownership interests in Chelsea, against the modest change-in-control payments they stood to earn, it is clear that the Defendants' interests were aligned with the

17

Thus, the Plaintiffs are left to rely on the most difficult path to overcome dismissal of a claim based on bad faith: that the action complained of is otherwise inexplicable, so that bad faith—a motive other than the interest of the Company—*must* be at work. The question before me is, simply, was the Chelsea Board's decision to exclude the Projections so egregious on its face that—notwithstanding that there are no allegations that the directors are interested or lack independence—the Plaintiffs have stated a case that it is reasonably conceivable that the Defendants acted in bad faith?

Here, the answer is no. I find that it is not without the bounds of reason—in fact, it is readily explicable—that the Board would decline to use the Projections to value the Company, as both are highly speculative. The first, the No-Midodrine Projections, reflect an increased market share for Northera should Midodrine be taken off the market. As the Company had indicated for several years in its 14D-9 statements, however, the Board had no assurances that Midodrine would ever be discontinued.[57] As Vice Chancellor Parsons found in the Bench Decision, the Board

---

stockholders; both would benefit from maximizing the value of the Company in the Transaction. Only Oliveto—the CEO—had more than a *de minimis* interest in a change in control, and the Plaintiffs do not contend that he controlled the Board. I note that Vice Chancellor Parsons found in the Bench Decision that the Plaintiffs failed provide a plausible explanation why the Defendants would not want to maximize value. *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, C.A. No. 9640-VCP, at 14 (Del. Ch. June 18, 2014) (Parsons, V.C.) (TRANSCRIPT).

[57] For example, the Company's 2009 14D-9 statement discloses to stockholders the possibility of Midodrine being removed from the market, noting that the Company has no assurance that the FDA will do so. *See* Will Aff., Ex. 6, at 3 ("Midodrine is the only approved compound for orthostatic hypotension in the U.S. and its removal could facilitate higher sales and/or more rapid

18

considered this issue in the context of the Transaction and found it unlikely that the FDA would pull Midodrine from the market. The second set of projections, the L.E.K. Study, only estimates potential revenue streams that *could* occur, over fifteen years later, without adjusting for risk. In order for the projections in the L.E.K. Study to be fulfilled, Northera would have to both be proven capable of treating additional conditions *and* be approved by the FDA for those uses. As with the No-Midodrine Projections, the Company has disclosed for years in public filings the other potential applications of Northera.[58] I note that the Projections were made available to potential buyers approached by the financial advisers touting the sale of the Company.[59] The Defendants argue, and I agree, that if the Projections were a realistic indication that the Company's value was hundreds of millions of dollars

acceptance of droxidopa in this indication. However the FDA has never removed a drug under similar circumstances and we can provide no assurance that they will do so in the case of [M]idodrine"). The Company's 2014 14D-9 statement echoes this concern. *See id.* at Ex. 1, at 21 ("[T]he Company Board discussed with Deutsche Bank and Torreya the history of midodrine, the only other currently approved drug for the treatment of orthostatic hypotension and certain projections prepared by management of the Company assuming that midodrine was taken off the market or would have a restriction for use added to its label by the FDA (the 'no-midodrine case'). The Company Board concluded that the no-midodrine case was highly speculative and, accordingly, not quantifiable and instructed Deutsche Bank not to take such case into account in its financial analysis.").

[58] *See, e.g.*, Will Aff., Ex. 7 ("2010 Form 10-K"), at 8 ("In addition to the indications for which we have established active clinical programs, we believe there are a significant number of other therapeutic indications in which norepinephrine function plays a key role and for which [Northera] may provide clinical benefit. To facilitate research in additional indications and maximize the long-term development potential, we have initiated an extra-mural development program that enables independent investigators to conduct clinical trials in their respective fields of expertise. . . . We plan to continue working with key opinion leaders to identify and evaluate additional potential indications for [Northera] and may provide [Northera] for future studies when deemed appropriate and as funding and availability of drug substance permits.").

[59] The Company's financial advisors contacted *84 potential purchasers. Id.*, Ex. 1, at 18–24.

19

higher than Lundbeck's offer, another bidder likely would have emerged throughout the 20-month long sales process. The Plaintiffs argue, and it is no doubt conceivable, that reasons exist which might have made it wise for the Board to include the Projections in the Company's valuation. This disagreement with the actions of the Board does not plead a case of bad faith, however. The Plaintiffs have failed to plead facts that demonstrate that the Defendants' decision to disregard the Projections in recommending the Transaction was so egregious that it is reasonably conceivable the Defendants acted in bad faith.

The Board, after deliberation and in consideration of the sale of the Company, instructed its advisors not to consider projections that its assets would increase in value, years in the future, on speculation that the FDA would approve one of its products for currently-prohibited uses, or would remove a competing drug from the market altogether. Both sets of projections involved contingencies over which the Company had no control, and which might never come to pass. The Board itself decided not to consider these projections in recommending the Transaction to the stockholders. Such actions do not, on their face, plead a conceivable breach of the Directors loyalty-based duty to act in good faith. No other grounds conceivably leading to a finding of bad faith are pled.

### III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted. An

20

appropriate order accompanies this Memorandum Opinion.

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| IN RE CHELSEA THERAPEUTICS INTERNATIONAL LTD. STOCKHOLDERS LITIGATION | ) ) Consol. C.A. No. 9640-VCG ) |

## <u>ORDER</u>

AND NOW, this 20th day of May, 2016,

The Court having considered Defendants' Motion to Dismiss, and for the reasons set forth in the Memorandum Opinion dated May 20, 2016, IT IS HEREBY ORDERED that Defendants' Motion to Dismiss is GRANTED.

SO ORDERED:


<u>/s/ Sam Glasscock III</u>

Vice Chancellor